104

CLINE *v.* MILLER.

5-3465 387 S. W. 2d 609

Opinion delivered March 8, 1965.

*Edgar E. Bethell* and *William M. Stocks, J. Marvin Holman,* for appellant.

*David J. Burleson,* for appellee.

CARLETON HARRIS, Chief Justice. John J. Cline was a resident of Clarksville, Arkansas, and, during his lifetime, owned substantial timber acreage in Madison County. This acreage included approximately 760 acres, which is the subject of the present litigation. On July 25, 1961, a suit was filed in the Madison County Chancery Court in behalf of Cline to quiet title to approximately 2,040

acres of land in that county. The pleading was amended on August 8 of the same year to allege that a warranty deed appeared of record, purportedly executed by Richard B. Morris, a real estate broker of Huntsville, conveying the 760 acres of land (heretofore mentioned) to Tom M. Miller, a resident of Graham, Texas.[1] This deed was dated November 19, 1960, and had been filed for record on December 8, 1960. Cline prayed that Morris and Miller be made parties to the suit, and he sought cancellation of the deed as a cloud on his title. Miller and Morris were summoned by constructive service.

Richad B. Morris filed no answer, and was completely in default. On June 29, 1962, a demurrer to Cline's petition was filed by Tom M. Miller. On March 22, 1963, a general denial was filed by Miller. On August 7, 1963, John J. Cline departed this life. An order of revivor was thereafter entered on December 30. On January 30, 1964, Miller amended his answer to allege that Richard B. Morris was a real estate broker, and that John J. Cline had listed his lands for sale with Morris; that Morris acted as Cline's agent, and that Cline knew of the deed from Morris to Miller, and had acquiesced therein; that accordingly, Cline, and those claiming through him, were estopped to deny the validity of the sale of the lands to Miller by Morris.

It appears from the evidence that Miller's negotiations and transactions were probably entered into with P. W. Morris, father of Richard B. Morris, though Miller testified that he never had any reason to think that he was dealing with anyone other than Richard B. Morris, until after the acquisition of the lands. At any rate, Morris (P. W. or Richard) signed the name of the son to the deed, and delivered the deed to Miller at his home in Texas on November 22, 1960, where appellee gave Morris a check in the amount of $7,965.00. According to Miller, Morris was not to cash the check until "he got the abstract and title opinion to me." A few days later,

---

[1] Miller's wife, Vinnie Miller, was likewise a grantee in the deed, and a party to the litigation. For convenience, since she did not testify we shall refer to appellees in the singular.

according to Miller, Morris called him, and told appellee that he (Morris) had deposited the check in the bank, first stating that he had done so "yesterday," and subsequently stating that it might have been "two or three days ago." On December 8, the deed was placed of record, and on the same date, payment on the check given by Miller was refused by the First National Bank in Graham, Texas. Miller thereafter covered the check, which was paid on December 12. According to Miller, he made a trip to Huntsville, apparently some time between November 19 and December 12. "I demanded of Mr. Morris again to get me those abstracts, and my title opinion, or else refund me my check, or if he had cashed it, to refund my money; and I wanted to get something done on it then, because I didn't appreciate being done that way." With Miller was a friend from Bryson, Texas, by the name of M. H. Williams. Miller testified that he met with Morris and John Cline; that he told Morris that he had talked with the District Attorney in Graham, and the United States District Attorney at Fort Worth, "because I got my money and paid him my money in Graham, Texas, that's where Morris got my money, * * *. And I was going to start proceedings immediately unless they dug up my money or dug me up those abstracts that that check had paid for." Miller was not permitted to testify to any conversations with Cline (dead man statute), but Williams testified that the man introduced as Cline stated to Miller, "You have no reason to worry about the title to this land. I own that land and know the title is good." This testimony (of Miller and Williams) was apparently decisive, for the court found in favor of Miller, the decree reciting:

"that the defendants Miller paid to defendant Morris the full agreed price for said conveyance in the amount of $7,695.00.

"The Court further finds that John J. Cline had knowledge of the said sale of the said lands to defendants Miller by his agent Morris, and that John J. Cline acquiesced in the said sale of the lands owned by him which were included in the conveyance from defendant Morris

to defendants Miller; and that those claiming said lands through John J. Cline are estopped from denying the validity of the said sale.''

The decree quieted and confirmed title in Miller and wife, as against the John J. Cline estate. In April, appellant filed a motion for a new trial, asserting that no meeting ever took place between Miller and Cline in the presence of Morris and Williams, and that Cline did not ratify or acquiesce in the execution of the deed by Morris to the Millers. Affidavits of P. W. Morris and Fred O. Gallaway were presented in support of the motion. The latter formerly served as manager of the Gallaway Lumber Company, of Clarksville, a company of which John Cline was president. Affidavits of Jack M. Cline and J. Marvin Holman were also attached. It was asserted that the new evidence was not, and could not have been, known to appellant at the time of trial, though he had acted with diligence. The court rendered a lengthy opinion denying the motion. Appellant appeals from the decree entered, and also from the order over-ruling the motion for new trial.

The record in this case is rather large, and is very confusing. This is partly occasioned by the fact that two Morrises are involved, though only Richard B. Morris was made a party to the litigation. Though it appears, from the overall evidence, that the man with whom Miller was dealing was P. W. Morris, rather than Richard B. Morris, and even though his own testimony indicates that he learned this to be true after the filing of the law suit, Miller, throughout his testimony, continued to refer to the party that he was dealing with as Richard Morris. For instance, Miller was asked:

''Q. Did you have any discussion with him (Morris) about how the deed was made out? In other words, if he owned the land or anything about who owned the title to it.

A. Yes Sir.

108

MR. HOLMAN: Now, I object to any statement made by Mr. Morris at that time; it would be hearsay.

MR. BURLESON: Your Honor, he is a party to this law suit.

THE COURT: Overruled. You may answer.

A. Now, state your question.

Q. Did you have any discussion with Mr. Morris about the condition of the title, about who owned the land at the time he brought this deed to you?

A. Yes, Sir, I did.

Q. As I understand it, the deed purports to convey title from Richard B. Morris and his wife to you and your wife?

A. That's correct.

Q. It covers all of the land which is involved in this lawsuit, some 760 acres, plus some other parcels?

A. That's correct.

Q. What discussion did you have about the title?

A. About the price?

Q. About the title?

A. He told me—

MR. HOLMAN: I want to object again, Your Honor, to anything Mr. Morris told him; Mr. Morris is not a party to this lawsuit.

THE COURT: Yes, he is. He was served by publication, warning order, and attorney ad litem appointed.

MR. HOLMAN: Which Morris is he talking about?

A. Richard B. Morris is the one I'm talking about. The only Morris I knew. The man that sold me this land, the United Farm Agency.''

Likewise, appellee, in his brief, treats the matter as though Richard B. Morris is the man that Miller dealt

with. Of course, if Miller's transaction was with P. W. Morris, evidence of what that individual said to appellee is inadmissible, P. W. Morris not being a party to the law suit. A large part of Miller's testimony dealt with conversations and various transactions with Morris, and if these conversations and transactions were inadmissible, appellee's case is considerably weakened. It is difficult to understand why the proper identities of P. W. Morris, and son, Richard B. Morris, cannot be clearly and firmly established when it appears that they lived in Huntsville for some time, and operated a real estate agency there. Logic compels the conclusion that both should have been known to numerous persons in Madison County.

There is also confusion in Miller's testimony, relative to whether he made the check given to Morris (which had been turned down because of insufficient funds) good before or after the meeting allegedly attended by John J. Cline, Morris, Miller, and Williams. Miller testified that this meeting occurred in Huntsville some time between November 22, 1960, when the check was given, and December 12, 1960, when the check was paid. It would seem that evidence could be offered which would more accurately fix this date. At any rate, Miller's testimony indicates that Cline approved the transaction before paying the check; however, he testified, as previously mentioned, that he went to Huntsville for the purpose of either obtaining his title opinion and abstracts, or to get Morris "to refund my money."

Several other facets of the case are likewise confusing, and we have concluded that, because of the state of the record, justice would be better served by remanding this case for additional testimony. While the general practice is to make a final determination of chancery cases that come before this court on appeal, we have on numerous occasions, directed the trial court to reopen a cause for the purpose of taking additional evidence. In *Wilborn* v. *Elston,* 209 Ark. 670, 191 S. W. 2d 961, this court said:

"We try chancery cases *de novo,* and the usual practice .on appeal is to end the controversy here by final judgment, or by direction to the trial court to enter a final decree. There are, however, exceptions to this practice, and it rests in the discretion of this court to determine whether, upon reversal of a cause, the same should be opened for a new trial. If the cause is heard and determined by the chancellor on an erroneous theory, or if it is not sufficiently developed in the trial court, this court may remand for further hearing on the whole case, or on certain issues. *Carmack* v. *Lovett,* 44 Ark. 180; *Long* v. *Chas. T. Abeles & Company,* 77 Ark. 156, 93 S. W. 67; *Gaither* v. *Gage,* 82 Ark. 51, 100 S. W. 80; *Carlisle* v. *Corrigan,* 83 Ark. 136, 103 S. W. 620."

In *Wear* v. *Boydstone,* 230 Ark. 580, 324 S. W. 2d 337, we said:

"While ordinarily, Chancery cases are decided upon the record before us, we have on several occasions, remanded where it appeared that in the interest of justice, the cause should be more fully developed. *Carlile* v. *Corrigan,* 83 Ark. 136, 103 S. W. 620. The record leaves unanswered possible pertinent questions, * * *."

See also *General Box Co.* v. *Scurlock, Comm. of Rev.,* 224 Ark. 266, 272 S. W. 2d 678; and *Ark. State Highway Comm.* v. *Elliott,* 234 Ark. 619, 353 S. W. 526.

Evidence was offered, but refused, which might be most pertinent in determining the controversy. For instance, counsel for appellee offered into evidence several letters, one of which, according to counsel, dealt specifically with this transaction. The court held that the letters were inadmissible, under the "dead man's statute,"[2] and refused to permit their introduction. This ruling constituted error. In *Josephs, Executor,* v. *Briant,* 115 Ark. 538, 172 S. W. 1002, Justice Hart quoted the Wisconsin Supreme Court, which had passed upon this same point. The court said:

"* * * The statute forbids the examination of a party, in his own behalf, in respect to any transaction or

---

[2] Arkansas Constitution, Schedule, Section 2.

communication had personally by such party with a deceased person, against parties who are executors, administrators, etc., of the deceased. [Citing Wisconsin statute] The case does not seem to come within the letter of the statute, and yet the communication was in some sense personal. But the personal transaction or communication of the statute, no doubt, means a transaction or communication face to face, or by the parties in the actual presence and hearing of each other. In every such case the statute excludes the testimony of the living party, upon the obviously wise and just ground that his adversary, whose cause of action or defense survives, and who was possessed of equal knowledge, and was equally capable of testifying to what the transaction or communication really was, has been removed by death, and so can not confront the survivor, or give his version of the affair, or expose the omissions, mistakes or perhaps falsehoods of such survivor. The temptation to falsehood and concealment, in such cases, is considered too great to allow the surviving party to testify in his own behalf. The law has, therefore, wisely excluded him. But this reason for the exclusion is not applicable to the present case, at least not fully applicable. Could we know that Mr. Fox, if living, would testify that he never wrote the letter in question—that it was a forgery—then indeed there would seem to be strong reason for excluding the testimony. But we do not and can not know this, and it is only by assuming the suppositious character of the letter, and that Mr. Fox would have so testified, that any appearance of hardship exists.''

See also *Green* v. *Green*, 231 Ark. 218, 329 S. W. 2d 411. Of course, whether the letter (letters) was actually written by Cline is a matter that would be resolved by the proof.

This litigation has another unusual aspect in that two of appellant's attorneys withdrew after the trial had started, because of the fact that they deemed it necessary to tesify in the case. Attorney Hall withdrew on the first day, before any testimony was taken, and Attorney

Stewart withdrew after appellee had completed his case, this attorney testifying on rebuttal.

As stated, because of the confusing state of the record, we reverse the decree, and remand the case with directions that it be reopened for further proceedings. Let it be understood that, in making this order reversing the decree, we are not indicating that appellee should not prevail. Our intention is only to place the parties in equal status, unprejudiced by prior findings of the trial court. The present record remains a part of the proceedings, but the Chancellor should permit appellant and appellee to offer any additional competent evidence, either in the form of additional evidence from witnesses who have already testified, or evidence by new witnesses; also, the litigants should be permitted to join as parties plaintiff or defendant any person who should properly be made a party. In such event, of course, any additional party should be given the opportunity to object to any evidence taken at the last trial, and presently constituting a part of the record, which he feels is not admissible as to him.

It is so ordered.