JOE F. RUSHTON, M. D. *v.* FIRST NATIONAL BANK OF MAGNOLIA

5-4417                                    426 S. W. 2d 378

Opinion delivered April 1, 1968
[Rehearing denied May 6, 1968.]

504

*Harry B. Colay, Chambers & Chambers,* and *Warren & Bullion,* for appellant.

*Keith, Clegg & Eckert* and *Gaughan & Laney,* for appellee.

CONLEY BYRD, Justice. This appeal by Joe F. Rushton, M. D., is one of a number of lawsuits arising from the dismissal of W. C. Blewster as president of appellee First National Bank of Magnolia. Dr. Rushton contends that in endorsing certain notes for Numark Manufacturing Company he was acting as trustee for the benefit of the bank. The trial court found against Dr. Rushton because (1) the acts, if they had occurred, would be ultra vires and not binding on the bank; (2) Dr. Rushton failed to prove the facts alleged; (3) Dr. Rushton was barred by the "clean hands" doctrine; (4) Dr. Rushton, having recognized his liability as personal, was estopped to assert the trusteeship or guaranty of the bank; and (5) Dr. Rushton's claim was barred by the statute of frauds. In addition to denying relief, the trial court entered judgment against Dr. Rushton upon the bank's counterclaim for $158,230.47, which included a note for $97,787.77, dated April 3, 1963, and signed by Dr. Rushton as trustee.

For reversal Dr. Rushton relies upon several points, but since there was error that calls for a complete new trial, we deal only with the alleged error of the trial court in permitting William A. Eckert, Jr., an attorney of record, to testify over Dr. Rushton's objection that the rule had been invoked and that Mr. Eckert had remained in the courtroom throughout the trial.

## UNCONTROVERTED FACTS

The record fairly establishes the following facts:

1. W. C. Blewster was president of the First National Bank of Magnolia from July 1942 until his termination on November 1, 1964. During his tenure the bank

had suffered no large losses and had foreclosed only twice prior to the foreclosure of the Magnolia Wood Products property. The bank had grown from $856,000 when he became active manager to $22,550,000 at the time of his termination. Mr. Blewster spent much of his time as bank president in trying to secure industries for Magnolia. In the words of Mr. T. A. Monroe, who succeeded Mr. Blewster as bank president, "Mr. Blewster ran the First National Bank of Magnolia. It was substantially a one-man banking operation."

2. Appellant Dr. Joe F. Rushton was a physician and surgeon in Magnolia, Arkansas. He had been a stockholder in the First National Bank of Magnolia since 1936 and a director since 1937 or 1938. He engaged in a number of enterprises—some with W. C. Blewster and some with Congressman Oren Harris, now U. S. District Judge for the Eastern District of Arkansas. His financial statement, as prepared by the First National Bank of Magnolia, on October 1, 1963, showed a net worth of $1,701,493.00.

3. T. A. Monroe, an insurance man, had been a director of the bank since 1951 and vice president from 1956 to 1964. Upon Mr. Blewster's termination, Mr. Monroe became president and served until September 1965. As president, he was a member of the bank's Executive Committee along with Mr. Eckert.

4. William A. Eckert, Jr., of Magnolia, Arkansas, had been attorney for the bank some fourteen years and a director since 1957. He served on the bank's Executive Committee along with Mr. Monroe, after Mr. Blewster's termination. He signed some of the pleadings herein as attorney for the bank, but most of the subsequent pleadings were signed by Gaughan & Laney. He did not examine any witnesses during the trial, but is shown here as counsel for appellee bank.

5. Odyssey Trailer Company was a corporation which Mr. Blewster was instrumental in organizing to

build trailers. At one time Mr. Blewster prevailed upon Dr. Rushton to take $2,500 in stock and later asked him to please take another $2,500, as that was all the city of Magnolia lacked to get the company started. After Odyssey was organized, Mr. Blewster and others prevailed upon the Columbia County Industrial Commission to erect a building for it through a bond issue. Odyssey was financed through the First National Bank of Magnolia. After some forty trailers had been built, it became apparent that their cost was too high and the company was a sick industry. Dr. Rushton and Mr. Blewster were on Odyssey's board of directors and had personally endorsed a note for $35,000 to the Republic National Bank of Dallas which was renewed several times.

6. Magnolia Wood Products Company was another industry that Mr. Blewster secured for Magnolia and that was financed by the First National Bank of Magnolia. This industry became sick, too; a friendly foreclosure was had; and on January 11, 1963, the foreclosure sale to First National Bank of Magnolia for the amount of its judgment debt of $52,705.45 plus interest and attorney's fee was confirmed.

7. Numark Manufacturing Company was the name given to the new venture resulting from a merger between Odyssey and Magnolia Wood Products Company. The Numark stockholders were the same as the stockholders of Odyssey and Magnolia. Dr. Rushton was elected president in his absence and urged to serve in that capacity by Mr. Blewster. Mr. Blewster was also on its board of directors. Numark obtained government contracts and operated until after Blewster's dismissal as president of the bank. It went into bankruptcy some time before trial of this case.

8. The minutes of the January 16, 1963, meeting of the Numark board of directors, with reference to the issues here involved, showed the following:

"W. C. Blewster stated that the First National Bank of Magnolia, Magnolia, Arkansas, had, by foreclosure proceedings, acquired title to all of the assets of Magnolia Wood Products Company, and that the bank is leasing the property to the corporation for a rental of $250 per month. He further stated that he and Mr. Drew had high hopes of arranging for the company to obtain an ARA loan so as to enable the corporation to purchase all of the assets of the old Magnolia Wood Products Company from the bank."

The minutes of the special meeting of the Numark board of directors on March 6, 1963, reflected the following:

"Mr. Blewster stated that the First National Bank of Magnolia had conveyed all assets of the old Magnolia Wood Products Company to Joe F. Rushton, Trustee, that Numark Manufacturing Company was in possession of the old Magnolia Wood Products properties under a lease agreement entered into by and between Joe F. Rushton, Trustee, as lessor, and Numark Manufacturing Company, as lessee. It was explained that it was anticipated that Numark should attempt to obtain from the Area Redevelopment Administration a loan in the amount of $200,000, so that the corporation might purchase from the Trustee all assets of the Old Wood Products Company. After a full and complete discussion of the matter, a motion was made by Charles Viering and seconded by Felton Roberson that the corporation should attempt to borrow $200,000 from ARA, with which to purchase all of the assets of Magnolia Wood Products Company and other property related thereto, title to which is now in Joe F. Rushton, Trustee."

9. On March 1, 1963, the First National Bank of Magnolia conveyed to Dr. Joe F. Rushton, Trustee, the property acquired in the Magnolia Wood Products Company foreclosure.

508

10. On April 3, 1963, Dr. Joe F. Rushton, Trustee, executed a deed of trust to Carl Black, Trustee for First National Bank of Magnolia, covering the property acquired from Magnolia Wood Products Company. This deed of trust was given to secure a note due 120 days from date, in the amount of $97,787.77, and signed by Joe F. Rushton, Trustee.

11. On April 3, 1963, Numark Manufacturing Company executed a note to the Texarkana National Bank for $35,000. This note was endorsed by Dr. Rushton and Mr. Blewster.

12. From April 3, 1963, to September 26, 1964, Numark was financed by First National Bank of Magnolia through overdrafts which had accrued in the amount of $225,000 as of September 26, 1964. On that date Numark executed a note for $225,000 to the First National Bank of Magnolia. Texarkana National Bank participated in the $225,000 note to the extent of $125,000 upon a personal guaranty of Dr. Rushton and Mr. Blewster. In addition Dr. Rushton pledged as collateral 24,675 shares of Berry Asphalt Company.

13. On October 26, 1964, Numark executed a note for $35,000 to Texarkana National Bank. This note was endorsed by Dr. Rushton and Mr. Blewster.

14. On November 1, 1964, Mr. Blewster was dismissed as president of the bank.

15. On November 23, 1964, Numark executed to Republic National Bank of Dallas, Texas, a note for $35,000, endorsed by Dr. Rushton and Mr. Blewster.

16. After Mr. Blewster's dismissal, Mr. T. A. Monroe found in Blewster's desk drawer an unexecuted instrument wherein Numark was mortgaging the Magnolia Wood Products to First National Bank as security for the $225,000 note. Realizing that the bank had no

security for its part of the $225,000 note and that title to the property was in Joe F. Rushton, Trustee, the bank, at Mr. Eckert's suggestion, joined with Joe F. Rushton, Trustee, in conveying by deed on December 20, 1964, the Magnolia Wood Products Company property to Numark Manufacturing Company, and simultaneously caused the unexecuted deed of trust from Numark in favor of the bank to be executed. This removed this security from the $97,787.77 note signed by Dr. Rushton as Trustee and placed it on the $225,000 note of Numark.

17. On December 28, 1964, Numark executed to Republic National Bank of Dallas its note for $37,390.69, endorsed by Dr. Rushton and Mr. Blewster.

18. On January 25, 1965, Numark executed to Republic National Bank of Dallas its note for $19,000, also endorsed by Dr. Rushton and Mr. Blewster.

19. On February 25, 1965, Dr. Rushton signed an instrument acknowledging that he was indebted to the First National Bank for, among other things, the $97,787.77 note as trustee. In addition he pledged as collateral security 10,500 shares of Berry Petroleum Company capital stock and 140 shares of Magnolia Broadcasting Company capital stock.

20. After Dr. Rushton had parted with the 10,500 shares of Berry Petroleum stock and 140 shares of Magnolia Broadcasting stock, W. A. Eckert, Jr., the bank's attorney, suggested to Dr. Rushton that he should employ his own counsel.

21. From the time Mr. Blewster was dismissed from the bank until Dr. Rushton made his collateral pledge with the bank, all transactions between the bank and Dr. Rushton were handled by T. A. Monroe and W. A. Eckert, Jr., usually together.

## CONTROVERTED FACTS

W. C. Blewster on direct examination testified that Dr. Rushton became trustee in the transaction leading up to and involved in this lawsuit because he, as president of First National Bank, asked him to act as trustee; that in attempting to keep Numark going he was trying to prevent First National Bank from having a substantial loss; that this transaction was for the bank's benefit and at his suggestion, and it was not his intention for Dr. Rushton to be personally liable; and that up until this Numark transaction First National Bank had never sustained large losses and everything was going well until the ARA ran out of money and he was forced to resign. Mr. Blewster stated that First National Bank had had other trusteeships to work out situations like this one and they had never been questioned by the bank examiners.

Dr. Rushton testified that when it became apparent that Odyssey was not going to make a go of the trailer business, he told the board of directors that the best thing to do was to shut it down and let it fold up. Mr. Blewster then suggested that Mr. Drew, manager of Odyssey, take a look at the Magnolia Wood Products property and see if business could be continued with a merger of the two companies. The bank had taken a loss in both companies and Mr. Blewster did not want to see that happen. At Mr. Blewster's suggestion, Mr. Drew decided that perhaps he could put the two companies together, go into wood products manufacturing and pull the situation out of the fire. Dr. Rushton stated that he could not attend the meeting after the merger because of surgery, and that when he called Mr. Blewster to see what they had decided, he found that they had elected him president. He reluctantly accepted the office at Mr. Blewster's request. Mr. Blewster told him that through Hamilton Moses_ they were going to arrange an ARA loan; that Mr. Blewster wanted him to act as trustee to make loans to this new company so the bank could get

its money back from the ARA loan. Dr. Rushton stated that his position as trustee was explained at a meeting of the bank's board of directors; that the bank had asked him to act as trustee for it so the bank could arrange for him to pay off its indebtedness on notes it was about to lose; that this was the same arrangement the bank had used before with Mr. Shanehouse and Mr. Varner and one or two others who had served in the same capacity as had Dr. Rushton; that all the time endeavors were being made to secure an ARA loan and that while he himself had nothing to do with it, he knew it was being done because the bank had helped in filling out the forms.

With respect to the February 25, 1965, collateral pledge (see item 20 above) Dr. Rushton testified.[1]

After Mr. W. C. Blewster had resigned, I put up my stock in Magnolia Broadcasting Company and the rest of the stock I had in Berry Petroleum Company to secure the $97,000 mortgage. I did not receive any money or consideration for the warranty deed to Numark Manufacturing. The reason I put up this security for the trustee mortgage in 1963 was that T. A. Monroe called me to come to the Bank. I went down there and Mr. Eckert told me I was in serious trouble. He said that W. C. Blewster was going to the penitentiary and I might be going with him. He said I had better clear my name at the First National Bank; that I was part of the whole thing. He asked me what I did with the money, and I said I never got any of the money, and he said the money is somewhere and you might be investigated by the Federal Government and you will lose everything you have; your home and clinic and everything, and I thought I was doing the right thing. I followed the advice of the Bank's attorney and put up this security. I was subsequently advised by legal counsel that I

---

[1]For brevity, we have used appellant's abstract of Dr. Rushton's and Mr. Monroe's testimony on this point.

did not have to do that. I put up my stock in Magnolia Broadcasting Company and about 10,500 shares of Berry Petroleum. This was after the blowup at the Bank. I did not put up any security in 1961 when I signed the Odyssey note. The Magnolia Broadcasting Company stock and the Berry Petroleum stock was typed on that note without my consent, and I did not know it was on there.

I was coerced into putting up the security on the Bank note. Mr. Eckert was acting as my legal advisor while he was acting as legal advisor for the Bank. I was not paying him any fee. We had been close friends for 10 or 15 years and I had no reason not to trust him.

Mr. T. A. Monroe testified:

In some ways, the whole board of directors had been derelict in their duty but in other ways they did not fail because they did not know some of the things that were going on. . . I did not tell Dr. Rushton in the executive meetings between myself, Mr. Eckert and Dr. Rushton that his activities were in violation of federal law and he was in serious trouble. I did not hear Mr. Eckert tell him that. I might have gone out of the meetings or been called out. I don't know. But Mr. Eckert was advising Dr. Rushton on his legal liability . . . We told him if he put up securities it would be his free and voluntary act. . . We merely asked him to secure the loan to prevent him from being embarrassed before the board of directors. We wanted the securities brought in but I don't think we mentioned voluntary. . . It was more just appealing to him to help us get his loan straight. We did not tell him it would be his free and voluntary act.

Later Mr. Monroe testified:

I don't recall saying to Dr. Rushton "what did you do with that money" a number of times. It did come up on one or two occasions. I didn't emphasize. A statement like that might carry its own emphasis. I told Dr. Rush-

ton the FBI was investigating the bank, but if he put up property and securities, it would take the heat off. I don't think Dr. Rushton was threatened to the extent of being intimidated.

"Q. When was the first time you heard Doctor Rushton state to anyone in your presence that he was acting as trustee for the First National Bank of Magnolia, in taking this Numark property?

A. That was in our first meeting with him.

Q. That was in your first meeting with Doctor Rushton?

A. Yes sir.

Q. When Mr. Laney asked you this question on direct examination, every time he asked you this question you answered 'no.' You had heard him tell other people in your presence that he was acting as trustee for the bank, had you not?

A. Yes sir, but not in a Board Meeting. Mr. Laney asked me if I had heard him say that in a Board Meeting.

Q. Then all of your answers of 'no' pertained only to Board Meetings, Mr. Monroe?

A. Yes sir.

Q. Mr. Laney told you that he was going to ask those questions and would put in the word 'Board Meetings'?

A. Yes, but I knew he would have to ask that."

Following Mr. Monroe's testimony, W. A. Eckert was called as a witness to testify for defendant. At the

time he was called, counsel for Dr. Rushton made the following objection:

> "I want to object to Mr. Eckert testifying. He has sat here during the entire testimony and we asked for the rule on the witnesses and he did not leave the Courtroom, Your Honor."

The court overruled this objection and thereupon Mr. Eckert testified that he was at several conferences with Dr. Rushton over a period of time from December 1964 to February 1965 and the first time he ever heard about Dr. Rushton claiming he had been authorized to act as agent or trustee for the bank was when the complaint was filed in the instant suit; and that no one had ever coerced anyone in his presence in connection with the Dr. Rushton affairs. Mr. Eckert stated that he had regularly attended the bank's board meetings and had never heard any discussion at any of them that the bank had agreed to hold Dr. Rushton harmless in connection with his endorsement of papers or notes for Numark.

Following direct examination of Mr. Eckert, counsel for Dr. Rushton refused to cross-examine him and made the following motion:

> "Your Honor, we ask that the testimony of this witness be stricken from the record. By his own testimony, he has admitted that he is Counsel for the bank and, therefore, he is ineligible to testify. He was a known witness and he was allowed to remain in the Courtroom. Mr. Rogers was announced to be the representative of the defendant bank, Your Honor, not Mr. Eckert."

Appellant's argument with reference to the rule is as follows:

> "At the beginning of this case the plaintiff asked 'the rule' on the witnesses. The defendant announced that the president of the bank, Mr. Rogers, would be the representative of the defendant cor-

poration who was permitted to remain in the court room. Counsel for Dr. Rushton pointed out that Mr. W. A. Eckert was sitting at the counsel's table and that Mr. Eckert had participated in a number of these transactions and would undoubtedly be called as a witness. Counsel for the bank announced that Mr. Eckert would participate as an attorney and would not be called as a witness."

\* \* \*

"We recognize that the trial court has a great deal of discretion in applying the rule but that discretion is not without limitation. When it is called to the attention of the Court and counsel that an obvious witness is in the courtroom and specific objection is made to that witness, it is an abuse of discretion for the trial court to permit that witness to participate in the trial of the case and then take the witness stand and testify."

Appellee in its argument states the matter as follows:

"It is true this case was conducted under 'the rule.' This did not exclude Mr. Eckert who was an attorney of record for the Appellee. He had every right to be present and it was his duty to be there having been the bank's attorney through all the years during which the involved transactions occurred. The actual trial of the case was conducted by other counsel.

"As we see it the only question which could possibly be involved is whether Mr. Eckert's testifying was proper under Canon 19 of the Canons of Professional Ethics. This Canon reads:

'When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like he should leave the trial of the case to other counsel. Except

when essential to the ends of justice, a lawyer should avoid testifying in Court in behalf of his client.'

"In the opinion of bank's counsel conducting the trial it was 'essential to the ends of justice' that Mr. Eckert testify and he was called as a witness. If trial counsel was in error in his appraisal of what was 'essential to the ends of justice' then he is subject to criticism but we fail to see anything else involved."

## CONCLUSION

The participation of counsel and his partners in a case in which one of them is a witness is dealt with at length in Formal Opinion 220 of the American Bar Association's "Opinions of the Committee on Professional Ethics."[2] As there pointed out, it puts counsel in the position of both advocate and witness, one of which requires the lawyer to be partisan and the other of which requires him to be factual. It thus robs the trial of that appearance of fairness which should characterize every court hearing. *Morgan* v. *Roberts,* 38 Ill. 65 (1865); *Gajewski* v. *United States,* 321 F. 2d 261 (1963).

Ark. Stat. Ann. § 28-702 (Repl. 1962) provides, "If either party requires it, the judge may exclude from the courtroom any witness of the adverse party, not at the time under examination, so that he may not hear the testimony of the other witness." In construing this statute, *Arkansas Motor Coaches, Ltd.* v. *Williams,* 196 Ark. 48, 116 S. W. 2d 585 (1938) and *Oakes* v. *State,* 135 Ark. 221, 205 S. W. 305 (1918), we have consistently held that it is within the discretion of the trial court to permit a lawyer to testify in a case even though the rule has been invoked. The above cases, however, do not show the situation that developed in this case. Here the record conclusively establishes that Mr. Eckert was one of only

---

[2]Formal Opinion 220 is attached hereto as an addendum.

three key witnesses in this lawsuit from the beginning. Nor can we agree with appellee that it became necessary to the ends of justice during the trial for Mr. Eckert to testify. Rather, it appears that the bank took a calculated risk that Dr. Rushton could not make out a case.

Upon both grounds we hold that the trial court abused its discretion in permitting Mr. Eckert to testify, for Dr. Rushton's whole lawsuit depended upon the credibility of the testimony of Dr. Rushton, T. A. Monroe and W. A. Eckert during the meetings held from December to February.

Usually chancery cases such as this are tried de novo in this court but in such instances we have the benefit of a complete record. Here it is obvious that the bank would like to have the testimony of Mr. Eckert. Furthermore, according to Dr. Rushton's reply brief, he would like to have the opportunity to show that the bank has taken Dr. Rushton's position in a lawsuit against U. S. Fidelity & Guaranty Company in the U. S. District Court for the Eastern District of Arkansas, Western Division. Thus we find that we are in much the same position as that involved in *Cline* v. *Miller,* 239 Ark. 104, 387 S. W. 2d 609 (1965). Therefore, we are reversing and remanding the case for a complete new trial unprejudiced by any findings heretofore made.

Reversed and remanded.

## *ADDENDUM*
## FORMAL OPINION 220

### (July 12, 1941)

CANONS INTERPRETED: PROFESSIONAL ETHICS 6, 19

The opinion of the committee was stated by Mr. Drinker, Messrs. Miller, Phillips, Brown, and Jackson concurring, Mr. Houghton and Mr. Brand dissent.

A former member of this Committee has questioned the soundness of certain generalizations in our *Opinions* 33, 50, and 185 relating to the conduct by a lawyer of litigation in which one of his partners has been or may be a material witness, and has propounded to us the following specific questions:

A member of a law firm has represented a decedent in connection with a gift subject to federal gift tax, having drawn all the papers, calculated and paid the tax, and given an opinion to his client that the gift was proper and not made in contemplation of death. The lawyer also represented the decedent in connection with the drafting of his Will, and was expected by the decedent to represent his estate, which the Executor and the family of the decedent also desired.

After the client's death, the attorney and his firm are retained to represent the estate. Subsequently, claim is made by the Federal Government that the gift was made in contemplation of death, and a tax is assessed. The attorney who represented the decedent is a necessary witness to defend the gift.

Is it unethical for his partner to continue to represent the estate in opposing the claim of the Federal Government?

In cases involving the question as to whether one member of a firm may represent a client in a case where his partner is a necessary witness, should a distinction be drawn between:

(a) Cases where the lawyer must take a position *adverse* to that supported by his partner as a witness, and cases where the lawyer supports his partner's testimony?

(b) Cases in which the partner is required to testify in connection with matters concerning his *professional* duties, as distinguished from cases involving testimony relative to other matters?

Is not the problem involving participation by a lawyer in litigation where his partner is a necessary witness, one which should not be covered by a general rule of ethics, but by a more flexible provision such as would involve the addition to Canon 19 of the following paragraph?

"It is improper for an attorney to act as counsel in a matter as to which he or his partner has testified or will be required to testify, except by special permission of the tribunal in which he is to appear as counsel."

*Canon* 19 provides as follows:

"When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."

In *Opinion* 33 we held that where a law firm had represented an imbecile in procuring relief for her by reason of her imbecility, it was unethical for any member of the firm subsequently to accept employment involving the assertion that she was not an imbecile. We there said that

The relations of partners in a law firm are so close that the firm, and all the members thereof, are barred from accepting any employment, that any one member of the firm is prohibited from taking.

In *Opinion* 50, without stating the facts of the case before us, we referred to Court decisions condemning generally, as a breach of the rules of professional conduct, the acceptance of employment by a lawyer who knows that he will be a material witness for his client, or his testifying, where already employed, "except in those rare cases where, from some unforeseen event occurring in the progress of a trial, his testimony becomes indispensable to prevent an injustice."

We further said that, even though his zeal as a lawyer might not influence his testimony as a witness, the public might suspect that it would,—a situation which the lawyer should avoid. After referring to the principle of *Opinion* 33 that a lawyer is precluded from accepting or continuing in a case in which any of his partners could not properly be employed, we stated broadly that a lawyer may not properly accept a case in which he has reason to believe that he or any of his partners will be a material witness and must ordinarily withdraw if and when, in the course of the proceedings, such becomes apparent.

In *Opinion* 185 we held, referring to *Opinions* 33 and 50, that it was improper for a lawyer to accept employment in a case where it would be his duty to attack the essential testimony to be given by his partner on behalf of the other side.

On February 10, 1941, the Committee on Professional Guidance of the Philadelphia Bar Association rendered an opinion on facts substantially similar to those involved in the case now submitted to this Committee. The Philadelphia Committee discussed our *Canon* 19 and our *Opinions* 33, 50, and 185. While expressing high regard for our Opinions, the Philadelphia Committee declined to follow the statements in *Opinion* 50 whereby a lawyer is broadly precluded from accepting or continuing employment in a case in which his partner has been or will be a material witness. The Philadelphia Committee agrees with the conclusions in our *Opinions* 33 and 185 that a lawyer may not assume or continue a position adverse to that for which his partner has been or will be a witness, and agrees that a lawyer should not himself conduct a litigation in which he himself must be a witness, unless the ends of justice clearly require it. The Philadelphia Committee constructs *Canon* 19 as not, on its face, precluding the ''other counsel'' from being a member of the partnership with which the witness is affiliated. It holds, however,

We are unable to agree with the reasoning which attaches any impropriety to the participation of a lawyer as a witness and his partner as trial counsel in a matter where the partners have represented the client from the outset and where they are not engaged upon opposing or conflicting sides of the controversy.

This committee is also of the opinion that the opposing counsel and trial judge should be advised as to the status of the partner as a witness.

The Philadelphia Committee further holds that, in cases in which a partner appears as a witness, it would be improper for the lawyer to conduct the case for a contingent fee.

With the decisions in *Opinions* 33 and 185, where the lawyer would have been required to attack his own testimony or that of his partner, we are still in entire accord. To accept or continue such employment would necessarily place the lawyer in the inconsistent position condemned by *Canon* 6.

We are also in accord with the position that where a lawyer will necessarily be a material witness as to matters not relating to his professional duties, he should not, in the first instance, accept employment in the case.

The Committee as at present constituted is of opinion, however, that a distinction may often properly be drawn in cases where a partner's testimony relates to matters occurring in the course of his professional duties, and also in cases where the lawyer has long and intimate familiarity with the details of the matter in litigation, so that his withdrawal will necessarily deprive his client of knowledge and experience of peculiar and irreplaceable value.

We therefore consider both unwarranted and unwise the broad generalizations in *Opinions* 33, 50 and 185 to

the effect that a lawyer may never properly accept employment where his partner is likely to be a witness and that he must withdraw from a case when such probability develops.

The question frequently arises in connection with cases like that here propounded. In such cases the lawyer for the decedent has prepared all the papers, knew the decedent, and knew exactly why he did what he did. His firm, however, naturally represents the decedent's estate, which properly relies on them to sustain the gift. By reason of their knowledge of the decedent's affairs they are peculiarly qualified to do so, and unless they can do so the estate will be deprived of their valuable services.

In such cases there does not appear to be any impropriety in the lawyer who drew the papers and knew the testator testifying to the facts surrounding the execution of the deed of gift, and in his partner representing the estate to sustain it. The possibility of the witness moulding his testimony in order to secure a higher fee for his firm is more than balanced by the injustice to the client of depriving the latter either of a necessary witness or of a specially qualified lawyer. The possible interest of the witness would merely affect his credibility. While it is true that such a situation might require the lawyer for the estate to argue the veracity of his partner, this would be equally the case where the witness was his friend or his near relation. Actually, if the partner of the witness withdrew from the case and asked one of his colleagues at the bar to take his place, the latter would be not less assiduous in standing up for the witness' reputation as would the latter's partner.

We do not construe the words "other counsel" in *Canon* 19 as necessarily excluding a partner of the lawyer who must become a witness.

In our opinion, therefore, it cannot properly be said in every case that a lawyer may not properly appear in

a case where his partner could not; but that each case should depend on its own facts.

Like many other problems arising in the course of professional employment, this involves questions of good taste as well as of ethics, its solution depending largely on the surrounding circumstances, in the light of which each case must be resolved, within the limits above outlined, by the lawyer, with, of course, full disclosure to opposing counsel and to the tribunal.

MR. HOUGHTON, dissenting:

From certain statements and conclusions in the opinion of the majority of the committee, I respectfully dissent.

I do not agree that the criticized statements contained in *Opinions* 33, 50, and 185 relating to the conducting of litigation by a lawyer in which one of his partners has been or may be a material witness, are wrong or should be departed from. Neither do I agree that it is proper for one partner to be a witness and another the advocate in a trial even in cases where the lawyer acting as a witness has long and detailed familiarity with the details of the matter in litigation, so that his withdrawal may necessarily deprive his client of knowledge and experience of irreplaceable value.

I am firmly of the opinion that no lawyer should be both witness and advocate, excepting under those circumstances recognized or permitted by existing Canons, and I am further of the opinion that the existing Canons should not be amended to justify the conclusion reached by the majority opinion.

If we start with the premise that it is improper for a lawyer to be both a witness and an advocate in a contested case, then it is my firm opinion that his law partner should likewise be barred from so doing. The functions of a witness and an advocate should not be carried

out by the same person. The function of a witness is to tell the facts as he recalls them in answer to questions. The function of an advocate is that of a partisan.

*Canon* 19 provides in effect that, except as to formal matters, when a lawyer is a witness for his client, he should leave the trial of the case for other counsel. This Canon has been construed in committee *Opinions* 33, 50, and 185, to prohibit one partner from acting as a witness and another partner as an advocate in a contested case. The Canon itself is merely a crystallization of recognized views of the bar prevailing for many years.

In the case of *Roys* v. *First National Bank*, 183 Wis. 10, where the court had under consideration the matter of the propriety of an attorney in a case appearing as a witness to contested facts, the court called attention to *Canon* 19 and stated:

> This rule is not to be allowed simply because the American Bar Association has adopted it, but with better reason because it states ethical considerations that must appeal to every lawyer as sound. A lawyer has a retainer—as a witness he is not entitled to such. He will find it hard to disassociate his relation to his client as a lawyer and his relation to the party as a witness. This case bears witness of that fact.

The soundness of the Canon is evidenced by many opinions of various courts. Lord Campbell, in his Lives of the Chancellors, in relating the fact that the solicitor general who was conducting the prosecution against Sir Thomas More, offered himself as a witness for the Crown, said that he did it to his eternal disgrace, and to the eternal disgrace of the court which permitted such an outrage on decency. *Stones* v. *Byron*, 4 Dowl. & L. 393, Note.

In the case of *Alger* v. *Merritt*, 16 Iowa 121, the Iowa court held that no attorney having a just concep-

tion of his true and proper position will willingly unite the character of counsel and witness in the same case, stating in effect that experience has shown that those who, on repeated occasions, allow themselves to be thus used, are certain to feel most keenly the consequences of their indiscretion, and that such testimony might even be excluded, not because the source of proof is regarded as unreliable, but because public policy and the integrity and welfare of the profession dictate that no one should be at the same time both advocate and witness for his client.

In the case of *Grindle* v. *Grindle*, 240 Ill. 143, 88 N. E. 473, the court condemned the conduct of an attorney who had assumed the double burden of acting as solicitor in a case and furnishing the evidence necessary to success.

In an early Pennsylvania case, *Frear* v. *Drinker*, 8 Pa. 520, the court said it was a highly indecent practice for an attorney to examine witnesses, address a jury and give evidence to contradict the witnesses.

Many courts have held that it is the duty of an attorney to withdraw from the case as soon as he learns that there is a necessity for him to be a witness therein.

I believe that it is the unanimous opinion of the Bar and courts passing on this question that it is improper for an attorney to be both witness and counsel in a contested case.

Is the practice to be condemned any less because a partner of the attorney witness is the advocate in the case?

In *Opinion* 33, rendered March 2, 1931, it is stated:

... The relations of partners in a law firm are so close that the firm, and all the members thereof, are barred from accepting any employment, that

any one member of the firm is prohibited from taking.

The reason for the ruling was because of the close relationships of the partners in a law firm.

In *Opinion* 50, rendered December 14, 1931, it is stated:

. . . As the lawyer cannot properly accept employment in any matter in which he knows he will be a material witness for the party seeking to employ him, his partner cannot properly accept employment from that party. Likewise, anything which requires a lawyer to withdraw from a case requires that his partners withdraw.

It is my opinion that the functions of a witness and an advocate should not be carried out by the same party, nor by different members of the same firm. A law partnership is in reality an entity. The members are bound by a partnership agreement. Any act of the one binds the partnership. I believe that the same reasons that bar one member of a firm from acting as a witness and counsel in the same case apply to all the partners as well. The witness, being a member of the firm, shares in the monetary rewards of his partners who are the advocates, and he, being a member of the firm, is lawyer and advocate. On the other hand, if one of the partners is a witness, the same firm is acting in dual capacity of witness and advocate.

The majority opinion attempts to justify such conduct in case a judge permits it.

This to my mind does not in any way affect the propriety of the act of counsel.

I do not believe the practice is made proper by consent or permission of the trial judge. The function of the judge should be limited to passing on whether the

circumstances of the particular case bring it within the exceptions of the Canons.

It may be, as pointed out in the majority opinion, that it might be desirable from a standpoint of the successful conduct of the case that one member of the firm act as witness and another as the advocate in cases where the partners have represented the client from the outset and have knowledge and experience gained from the relationship of attorney and client. These facts, in my opinion, do not alter or affect in any degree the reasons for the prohibitions of the Canon. The partners must elect whether they are to be in the case as witnesses or as advocates. Election really should be reserved for the client. If he elects to have his attorney act as his witness, he gets the full benefit of the attorney's knowledge of the facts. I do not believe that the client would suffer any hardship in most cases, because he is required to obtain a new advocate. In any event, the proper administration of justice should not be affected by the zeal of an advocate or his partner who insists on having the members of one firm act in the repugnant capacity of witness and advocate.

For the foregoing reasons, I respectfully dissent.

MR. BRAND, dissenting:

The sole question involved is whether a partner of a lawyer-witness is included in the words "other counsel" appearing in *Canon* 19.

It is clearly the intent of the Canon that the lawyer who must become a material witness for a client should not conduct the trial. The justification for this important rule of professional conduct applies with equal force to a partner of the lawyer-witness.

The statement in *Opinion* 33 that

The relations of partners in a law firm are so close that the firm, and all the members thereof, are

528

barred from accepting any employment, that any one member of the firm is prohibited from taking.

is sound.